UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GREG S. DAVIS,

               Plaintiff,

     -against-                            1:06-CV-1323
                                           (LEK/DRH)

BRIAN U. STRATTON, Mayor of Schenectady,
in his official capacity; MICHAEL N. GERACI,
Chief of Police, in his official capacity; SCHENECTADY
COUNTY COMMUNITY COLLEGE[1]; MICHAEL
D'ANNIBALE, Assistant Dean for Administrative
Services, Schenectady County Community College,
in his official and individual capacity,

               Defendants.

_____

## MEMORANDUM-DECISION AND ORDER[2]

       Presently before the Court is a Motion for summary judgment filed on November 16,

2007 by Plaintiff, requesting that the Court declare that Defendants unconstitutionally applied

New York's trespass statute to remove Plaintiff from Schenectady County Community College

("SCCC") and that Defendants be enjoined from interfering with Plaintiff's First Amendment

right to preach and videotape in the Quad area at SCCC.  Also before the Court is Defendant

Michael D'Annibale's cross-Motion for summary judgment requesting that this Court find that

_____

     [1] Although Schenectady County Community College was inadvertently included in the
case's caption in the Amended Complaint, it is not listed as one of the parties in the Amended
Complaint.  In addition, as discussed below (see section II.F), as an agency of the state, they are
immune from suit under the Eleventh Amendment.  Accordingly, SCCC is not a party to this action.

     [2] For printed publication by the Federal Reporters.

the Eleventh Amendment bars the action against Defendant D'Annibale, and to the extent that it does not, that he has qualified immunity from suit.

## I.      Background

This action  was commenced on October 31, 2006 by Plaintiff Gregory S. Davis ("Plaintiff" or "Davis"), seeking monetary damages and injunctive relief pursuant to 42 U.S.C. § 1983 against Defendant D'Annibale, Assistant Dean for Administrative Services at SCCC in his official and personal capacity, Defendant Brian U. Stratton, the Mayor of Schenectady in his official capacity, and Defendant Michael N. Geraci, Chief of Police, in his official capacity.  Am. Compl. (Dkt. No. 57).

On September 8, 2006, Plaintiff, an ordained Baptist minister, was arrested while preaching the Gospel on the campus of SCCC, a part of the State University of New York ("SUNY") System.  D'Annibale Dep. at 10 (Dkt. No. 68, Ex. B).

Prior to his arrest, Davis was situated in the Quad – an area within the center of several SCCC buildings where students often congregate – preaching the Gospel and handing out religious tracts.  See Pl.'s DVD (Dkt. No. 68, Ex. C).  Davis also videotaped his activities, as was his custom, in order to memorialize the event, to use as evidence in case he was unjustly accused of wrongdoing, and to remember persons he met in order to pray for them.  See Davis Affidavit at ¶ 6 (Dkt. No. 68, Att. 1).

After receiving a complaint from a female student regarding Plaintiff's activities, Defendant D'Annibale approached Plaintiff and asked him to cease videotaping, but Plaintiff refused.  Defendant D'Annibale then told Davis he was on private property, and asked Davis to

leave.  Davis again refused, and told Defendant D'Annibale that the SCCC campus was a limited public forum, and that he had the right to speak there.  Defendant D'Annibale told Plaintiff that he was not authorized to be on campus because he did not follow the correct procedures, and again reiterated that it was "private property."  Plaintiff inquired which procedures Defendant D'Annibale was referring to and stated that he had indeed followed them.  Defendant D'Annibale asked Plaintiff to leave again, and told him that if he did not leave, the police would be called. Plaintiff did not leave and instead continued to preach about First Amendment rights and the Gospel.

Defendant D'Annibale then called the police.  When the police arrived, they too asked Davis to leave.  Davis informed the police that he was exercising his right to preach in a public forum, but also stated that if he was going to be arrested, he would leave.  A police officer asked to see some identification, and Davis complied by handing the officer his drivers license.  Davis continued to tell the officers and Defendant D'Annibale that he had a right to be on the campus and to speak there.  After examining Davis' license and speaking briefly with Defendant D'Annibale, an officer arrested Davis.

Davis was initially charged with Criminal Trespass, New York Penal Law § 140.10(b), which only governs entry on elementary or secondary school property in violation of conspicuously posted rules or regulations.  See Davis Affidavit at ¶ 8 (Dkt. No. 68, Attch. 1); N.Y. Penal Law § 140.10(b).  Eventually that charge was dismissed, and Davis was instead charged under New York Penal Law §140.05, Trespass, which is graded as a Violation, not a crime.  See Davis Affidavit at ¶ 9 (Dkt. No. 68, Att. 1); N.Y. Penal Law § 140.05 ("A person is

guilty of trespass when he knowingly enters or remains unlawfully in or upon premises. Trespass

is a violation."). Rather than simply giving Mr. Davis a citation or summons on the new

Trespass Violation, the police rearrested him under the new charge. Davis Affidavit at ¶ 10 (Dkt.

No. 68, Att. 1).

Davis contends that the application of the New York Trespass laws unconstitutionally

chilled his rights of freedom of religion, freedom of speech, and freedom of assembly.


II.     **Discussion**

    A.     **Standard of Review**

Summary judgment should be granted if, when viewing the evidence in the light most

favorable to the nonmoving party, the court determines that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.

56(c). For summary judgment purposes, a dispute about a genuine issue exists where the

evidence is such that a reasonable jury could decide in the non-movant's favor. FED. R. CIV. P.

56(c); see also Beyer v. County of Nassau, 524 F.3d 160,163 (2d Cir. 2008). Rule 56(c)

mandates the entry of summary judgment against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Byrne

v. CNA Ins., Co., 2001 U.S. Dist. LEXIS 12975 (N.D.N.Y. 2001).

    B.     **Traditional First Amendment Analysis**

The main issue before the Court is whether Plaintiff has a First Amendment right to

preach, hand out leaflets, and videotape his actions in the Quad area of SCCC, and whether that

right was violated by his removal from SCCC.  To resolve this issue, the Court must decide

whether Plaintiff's actions are protected by the First Amendment and identify the nature of the

forum, because the extent to which the Government may limit access depends on whether the

forum is public or nonpublic.  The Court must then assess whether the justifications for exclusion

from the relevant forum satisfy the requisite standard.  See Cornelius v. NAACP Legal Def. &

Educ. Fund, Inc., 473 U.S. 788, 797 (1985).

>    **C.    Nature of the forum**

The right to a public forum for expression of ideas is fundamental to a democracy.

Concerned Jewish Youth v. McGuire, 621 F.2d 471, 473 (2d Cir. 1980).  However, "[t]he

existence of a right of access to public property" for the purpose of speaking there and "the

standard by which limitations on such a right must be evaluated differ depending on the character

of the property at issue."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44

(1983).

The right of use of government property for one's private speech or expression depends

on whether the property, by law or tradition, has been given the status of a public forum, a

designated or limited public forum, or rather has been reserved for specific, official uses.  Capitol

Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 761 (1995).  Regulation of speech

activity on governmental property that has been traditionally open to the public for expressive

activity, or which has been expressly dedicated to speech activity, is examined under strict

scrutiny.  Regulation of speech activity on a limited purpose public forum is examined under

heightened scrutiny.  However, where property is not considered a public forum and the government has not dedicated it to First Amendment activity, the regulation is examined only for reasonableness.  U.S. v. Kokinda, 497 U.S. 720 (1990).

Plaintiff Davis contends that the Quad is a traditional public forum.  Regulation of speech in traditional public forums is subject to strict scrutiny.  U.S. v. Grace, 461 U.S. 171, 177 (1983).  In order to survive strict scrutiny, the application of a statute or policy must be necessary to serve a compelling government interest.  Lopez Torres v. New York State Bd. of Elections, 462 F.3d 161, 184 (2d Cir. 2006).

Defendants, on the other hand, argue that the Quad constitutes, at most, a limited or designated public forum.  Although the parties seem to use the terms interchangeably at times, the Second Circuit has articulated the view that the phrases "designated public forum" and "limited public forum" are not synonyms.  See, e.g., N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 & n. 2 (2d Cir.1998) (describing a 'limited public forum' as a "sub-category of the designated public forum, where the government 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'") (quoting Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991)).

A "designated public forum" consists of property that would be a nonpublic forum except for the fact that the government has intentionally opened it for use by the public for expressive activity.  See Cornelius, 473 U.S. at 802.  Although the government is not required to open the forum in the first place, or to keep it open indefinitely, the government is bound by the same standards as apply to a traditional public forum, so long as it maintains the designated public

forum.  See Perry, 460 U.S. at 46.  Speech in a designated public forum has traditionally been subject to heightened scrutiny.  Grace, 461 U.S. at 177.  In order to survive heightened scrutiny, the statute or policy must be narrowly tailored to serve a significant government interest.  Grace, 461 U.S. at 177.

A "limited public forum" is a subset of the designated public forum, created when the government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.  Make the Road By Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir.2004).  For example, a university concert hall, designated for a particular type of speech by university-supported musicians, might be considered a "limited public forum." An "unlimited" designated public forum, in contrast, is a forum designated for expressive conduct by the government but not limited to a particular type of speech or speaker.  See, e.g., Deeper Life Christian Fellowship v. Board of Educ., 852 F.2d 676, 679 (2d Cir.1988); Calash v. City of Bridgeport, 788 F.2d 80, 82 (2d Cir.1986).  A state's reservation of a limited public forum to certain groups will be upheld if the restriction is content-neutral and reasonable in light of the purpose of the forum.  Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07 (2001).

As discussed in more detail below, the Court finds that there was no specific rule or policy in place at SCCC that was properly applied to exclude Davis from the campus.  Indeed, the SCCC Rules specifically note that "[n]othing herein is intended, nor shall it be construed, to limit or restrict the freedom of speech nor peaceful assembly."  SCCC Rules, at 1 (Dkt. No. 67, Ex. J).  Since there is no restriction of the Quad area to any specific type of speech or speaker, the

7

Court finds that the government has not created a "limited public forum." As discussed in more detail below, the Court also finds that the use of the trespass statute to exclude Plaintiff from the campus fails either heightened scrutiny or strict scrutiny. Accordingly, the Court need only apply heightened scrutiny in its analysis. However, for completeness, the Court will briefly discuss the nature of the forum.

In this case, the Quad is an outdoor area within the center of several SCCC buildings where students often congregate.[3] This area is within the boundaries of the campus, and combines the physical characteristics of streets, sidewalks, and parks, and is open for public passage. The physical characteristics of the Quad, if they were considered alone, would likely make it a traditional public forum. Grace, 461 U.S. at 177; Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939) ("Wherever the titles of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.").

However, "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." Grace, 461 U.S. at 177. Rather, the open nature of these spaces is only one factor for the Court to consider in determining whether the government has opened its property. Grace, 461 U.S. at 177. Other factors, none of which are dispositive, include the traditional use of the property, the objective

---

[3] The Court is considering only the Quad area, where Davis seeks to preach. This discussion is not intended to address other areas on the campus, which may be limited public fora (e.g. auditoriums, stadiums, or art galleries), designated public fora (e.g. classrooms), nonpublic fora (e.g. administration buildings or offices), or traditional public fora (e.g. the public streets and sidewalks which surround the campus [see Grace, 461 U.S. at 177]).

use and purposes of the space, and the government's intent and policy with respect to the property, including the presence of any special characteristics regarding the environment in which those areas exist.  See, e.g., Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506 (1969) (noting the "special characteristics of the school environment").

Certainly, a university "differs in significant respects from public forums such as streets or parks or even municipal theaters" and a campus need not "make all of its facilities equally available to students and nonstudents alike" and neither must a university "grant free access to all of its grounds or buildings."  Widmar v. Vincent, 454 U.S. 263, 268 n. 5 (1981).  Nonetheless, university campuses have traditionally and historically served as places specifically designated, by society and the universities themselves, for the free exchange of ideas.  Healy v. James, 408 U.S. 169, 180 (1972) (stating that universities represent a "marketplace of ideas").

In considering this tradition of free expression within specific parts of universities, the Quad's physical characteristics, and SCCC's policies and regulations, the Court finds that SCCC has opened the Quad area "for use by the public as a place for expressive activity", such that the property, a designated public forum, is protected for speech and is subject to the same standard as traditional public fora.  Perry, 460 U.S. at 45.  Accordingly, any restriction on speech must be content-neutral and narrowly tailored to serve a significant government interest.  Id.

## D.   No Applicable Regulation

In first considering the constitutionality of Plaintiff's removal from the campus, the Court finds, as discussed below, that SCCC had no on-point regulation by which Davis could be removed from campus.  Accordingly, there is no SCCC regulation for the Court to find

9

unconstitutional.  The Court will then analyze whether the use of the trespass statute to remove Plaintiff from the campus impinged on Plaintiff's First Amendment rights.

### 1.    Refusal to leave

Defendants allege various possible rules, regulations, or policies that Plaintiff Davis violated and that warranted his removal from the campus.  Defendants first claim that the campus policy requiring that "[n]o person . . . shall [r]efuse to leave any building or facility after being requested to do so by an authorized administrative officer" is the written policy which granted Defendants the right to remove Davis from the premises.  Dkt. No. 67, Ex. J.

Davis, at the time he was asked to leave campus and subsequently arrested, was not in, and thus could not refuse to leave a "building or facility."  Davis was outside, on the Quad, and certainly not in a building where he had the possibility of disrupting classes.  The Defendants do not allege that the Quad is a "building" or" facility" and Plaintiff Davis therefore could not be required to leave the campus under the auspices of this policy.

### 2.    Obstruction of Free Movement

Defendants further contend that Plaintiff Davis was removed because he was obstructing the free movement of persons and vehicles and causing a disruption, in violation of the "Rules and Regulations for Maintenance of Public Order on The Premises of the Schenectady County Community College".  See Dkt. No. 67, Ex. J.  There is no evidence, however, that Plaintiff's preaching on the quad obstructed the flow of traffic, and a review of the video contradicts such an allegation.  Further, Plaintiff's preaching did not rise the level of "[d]eliberately disrupt[ing] and prevent[ing] the peaceful and orderly conduct of classes, lectures and meetings . . ." Dkt. No.

10

67, Ex. J.  There is no evidence that students or professors attending classes were interrupted or at all affected by Plaintiff's preaching.

### 3. Photographs

Defendants also allege that Plaintiff Davis could be removed from campus for violating their blanket policy prohibiting any person from taking photographs of the children attending SCCC's daycare program.  Assuming, *arguendo*, that this regulation also prohibits videotaping of the children, there is no evidence that Plaintiff Davis violated this provision.  Davis was not in the vicinity of the daycare, and none of the images captured on the video are of children attending the daycare.  Further, applying this regulation to the entire campus would ban any photography or videotaping anywhere on the campus during any hours in which the daycare was operating.  Not only would this application be irrational and probably unwise for a college campus, but it would also be overbroad and therefore unconstitutional.  See Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973) (noting that showing that a law or policy punishes a "substantial" amount of protected free speech, judged in relation to the statute's legitimate sweep, suffices to invalidate all enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat to protected expression).

### 4. Section 5

Defendants also claim that Davis was properly excluded under Section 5 of the "Rules and Regulation for Maintenance of Public Order", which states that a person who violates the rules enumerated in other sections may be ejected from the campus.  In light of the showing that Plaintiff Davis did not violate any regulation that SCCC has in place, Section 5 (the penalties

clause) is inapplicable, and the Court finds that Defendants had no basis for Plaintiff's arrest or removal from the campus.  Dkt. No. 67, Ex. J.

**5.      Possible Unwritten Videotaping Policy**

Assuming, *arguendo*, that SCCC had an unwritten "policy" which was applied to prevent Mr. Davis from videotaping, the Court finds that the policy is void for vagueness within the meaning of the due process clause.  Similar to the analysis above regarding the daycare video/photography restriction, a policy banning all videotaping or photography may also be unconstitutional as overbroad.  However, without knowing the scope of this alleged unwritten "policy," the Court is unable to conduct a full analysis of whether the restriction would also be overbroad.  Nonetheless, because the alleged policy is unwritten, it vests virtually complete discretion in the hands of campus administration and local police to determine whether or not a person is in violation and is thus unconstitutional.

As generally stated, the void for vagueness doctrine requires that a policy or statute define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 358 (1983); Village of Hoffman Estates v. Flipside, 455 U.S. 489 (1982).  Courts have recognized that the principal element of the vagueness doctrine is the requirement that the policy or statute establish guidelines to govern its enforcement.  See Kolender, 461 U.S. at 358;  Smith v. Goguen, 415 U.S. 566 (1974).

The unwritten policy which SCCC now claims to have in place encourages arbitrary enforcement by failing to describe with sufficient particularity how and against whom it is to be

enforced.  Because it is unwritten, it also fails to put citizens on notice as to what behavior is prohibited.  Therefore the Court concludes that, even if there was a general policy against videotaping, it would be void for vagueness, and likely overbroad, and could not pass constitutional muster.   The same analysis would find unconstitutional any alleged application, based on some other unwritten policy, of the regulations which, as discussed above, the Court has already found were not applicable to Plaintiff's actions.  With no constitutionally sound basis present in SCCC's rules or policies permitting Defendants to remove Plaintiff from the campus, the Court turns to the more general issue of his removal from campus.

### E.    Exclusion of Plaintiff from Campus to Prevent Him from Videotaping

Since there is no policy in place on SCCC's campus regarding videotaping, the Court must analyze whether the application of either section 140.10(b) or section 140.05 of the trespassing statute was constitutional as applied to Plaintiff Davis.  Since the undisputed facts show that Plaintiff did not violate any regulation and was not disruptive, any attempt to exclude Plaintiff from the Quad for merely being present would have been improper.  See D'Annibale Dep. at 14 (conceding that the public at large is permitted to utilize the campus without prior permission).  Similarly, excluding Plaintiff for his preaching of the Gospel or handing out of leaflets would be unconstitutional.  See e.g. Marsh v. Alabama, 326 U.S. 501 (1946) (holding that state trespassing statute could not be used to prevent the distribution of religious materials on a town's sidewalk, even though the sidewalk where the distribution was taking place was part of a privately-owned company town).  Thus, the central question remaining before the Court is whether Plaintiff had a First Amendment right to videotape his actions on campus and, if so,

whether that right was violated when he was removed from the campus.

### 1.      Protected Activity

It is undisputed that preaching the Gospel and handing out leaflets are activities that are protected by the First Amendment.  Accordingly, the Court must now determine whether Plaintiff's videotaping is protected by the First Amendment.  Certainly the language of the First Amendment does not directly address videotaping.  However, the Constitution, as our polestar, need not keep pace with technology.  Although our society enjoys various technological advances, including the internet and video cameras, the brilliance of our founders is that they created a framework that is basic to our core values, stemmed in immutable freedoms, and which can continually be applied to the march of technology.

Defendants contend that Plaintiff's videotaping is a protected activity because it is not expressive conduct, since "[t]he video camera is not used to convey the content of the plaintiff's speech while preaching on campus" and thus "[t]he dominant use of the video camera is for something at a later date." Dkt. No. 70 at 8-9.  However, this logic and the emphasis only on the timing of the display is misleading and could prevent the capture, by still or video camera, of any activity unless the video or photographs were also contemporaneously displayed.  It would effectively prevent, for example, any videotaping of non-live broadcast news segments and all non-digital photography.  Although the technology that allows contemporaneous display of videotaping is available, such a requirement is unrelated to and goes against the basic purpose and protections of the First Amendment.

Not surprisingly, then, it has already been established in the Second Circuit that

14

"communicative photography is well-protected by the First Amendment." Porat v. Lincoln
Towers Community Ass'n, 2005 WL 646093 at 5 (S.D.N.Y. 2005); see also Bery v. City of New
York, 97 F.3d 689 (2d Cir. 1996).  In order for photography or videotaping to be protected it
must only be established that it: (1) has a message to be communicated; and (2) an audience to
receive that message.  Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515
U.S. 557, 568 (1995); Porat, at 2005 WL 646093 at 5.

Plaintiff's recordings demonstrate that he is preaching the Gospel–a recognized message
sought to be communicated.  In addition, because Plaintiff intends to and does spread his
message to the specific audience who views his web page over the internet, the videotapes are
"communicative" and therefore protected by the First Amendment.  His act of videotaping is
therefore protected by the First Amendment.

### 2.    Level of scrutiny applied

As discussed below, since the Court finds that the use of the trespassing statute as applied
to Davis cannot survive even heightened scrutiny, Plaintiff's argument that the Quad is a
traditional public forum is irrelevant, and the Court need only apply "heightened scrutiny" for the
remaining analysis.  In order to apply heightened scrutiny, the Court must determine whether the
government's restriction on Plaintiff's videotaping was narrowly tailored to serve a significant
government interest.

### 3.    Governmental Interest

In order to survive heightened scrutiny, Defendants' removal of Plaintiff from the campus
must be narrowly tailored to serve a significant government interest.  Defendants offer two

possible state interests, as discussed below.

### a.    Governmental Interest: Privacy Rights

One of Defendants' purported "state interest" is that Davis's posting of his recordings on his web page violate the privacy rights of the students and administrators at SCCC.  The Court recognizes that there is an "inherent tension between the protection of an individual's right to control the use of his likeness and the constitutional guarantee of free dissemination of ideas [and] images[.]"  Titan Sports, Inc. v. Comics World Corp., 870 F.2d 85,88 (2d Cir. 1989).  However, persons in public places are not ordinarily protected by considerations of privacy.  See Erznoznik v. City of Jacksonville, 422 U.S. 205, 212 (1975).  Assuming, as the Court has throughout this decision, that the Quad is a designated public forum, the Court must balance the magnitude of restricting the expression at issue against the asserted governmental interest in protecting the right of privacy.  See Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 972 (10th Cir. 1996).  The Court finds that the purported state interest, protecting the privacy rights of the students while they are in the Quad, an outdoor area which is open to the public, is insufficient to warrant restricting Plaintiff Davis' First Amendment right to videotape and post his preaching.  Preaching and spreading the message of the Gospel is a core form of protected speech, and regulating, in this manner[4],  Davis' right to videotape his message would block an important avenue of self expression and unduly restrict the marketplace of ideas.  See

---

[4] Defendants currently have no written regulations regarding videotaping on SCCC's campus.  Should Defendants implement such a policy, it must be a content neutral, reasonable time, place, and manner restriction such that it does not impinge on speech because of the message the speech conveys, is not overbroad, and clearly sets forth guidelines for its enforcement.  Applying the general trespassing statute is insufficient to pass constitutional muster.

Sherbert v. Verner, 374 U.S. 398, 403-07 (1963) (holding that the government may not burden conduct motivated by a sincerely held religious belief unless the government acts by the least restrictive means to further a compelling state interest).

### b.    Governmental Interest: New York Civil Rights Law

Defendants further claim that the posting of the videos on Plaintiff Davis' website violates Section 50 of the New York State Civil Rights law because he is using them in a commercial capacity without consent. Defs' Mem. at p. 8 (Dkt. No. 75). Section 50 states that "[a] person . . . that uses, for advertising purposes, or for the purpose of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person . . . is guilty of a misdemeanor." N.Y. Civ. Rights Law § 50.

Under New York law,[5] "[t]he terms of § 50 must be construed narrowly and not used to curtail the right of free speech." New York Magazine v. Metro. Transit Auth., 987 F.Supp. 254, 265 (S.D.N.Y. 1997).

'Advertising purposes' has been defined as "use in, or as part of an advertisement or solicitation for patronage of a particular product or service," and 'trade purposes' "involves use which would draw trade." Kane v. Orange County Publs., 232 A.D.2d 526, 527 (1st Dep't 1996). "The advertising prong of [Section 50] is not violated where the use of [a name] is not designed *primarily* to solicit purchasers. . . [of] products." Mason v. Jews for Jesus, 2006 WL 3230279, 4 (S.D.N.Y. 2006) (emphasis added) (quoting Herink v. Harper & Row Publishers, 607 F.Supp 657, 659 (S.D.N.Y. 1985)); see also Lerman v. Flynt Dist. Co., 745 F.2d 123, 130 (2d

---

[5] See King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d Cir. 1997) ("federal courts are bound to apply state substantive law to [a] state law claim")

Cir. 1984).  Further, "[t]here is a well recognized exception to [N.Y. Civ. Rights Law §50] for works of art and advertising that are undertaken in connection with a use protected by the First Amendment."  Altbach v. Kulon, 302 A.D.2d 655, 658 (3d Dep't 2003).

Defendants claim that Plaintiff makes commercial use of the images he generates and subsequently posts on his website, http://www.biblegreg.com/.  Defs' Mem. (Dkt. No. 75,  Att. 8).  Defendants allege, at best, a tenuous relationship between Plaintiff's internet video posts and any financial support Plaintiff receives from churches and individual donors who may or may not view the videos.  Defendants claim that Plaintiff "utilizes his web page, *in part*, to solicit opportunities to attend church meetings to promote his ministry, meetings from which [Plaintiff] receives financial support."  Defs' Mem. (Dkt. No. 75,  Att. 8) (emphasis added).  Because Defendants have failed to show that the use of the names and images of the students and administrators in video is designed *primarily* to solicit funds, Defendants fall short of satisfying the advertising prong of Section 50.[6]

Further, Defendants fail to illustrate that the videotapes "draw trade" because, at most, the videotapes afford Plaintiff the opportunity to attend church meetings, for which he may or may not receive financial gain or donations, and there is no evidence that Plaintiff, in any way, receives financial backing through the use of the posted recordings.  In fact, Plaintiff's website, www.biblegreg.com, does not solicit donations or contain any other outside advertising from which Plaintiff may garner profits.

_____

[6] Plaintiff has also noted that a primary purpose for his videotaping is for the tape to serve as a "witness" in situation such as the criminal trial that followed his removal from SCCC.  Plaintiff also informed Defendant D'Annibale of this purpose for his videotaping when D'Annibale approached him in the Quad.  See Pl.'s DVD (Dkt. No. 68, Ex. C).

Even assuming, *arguendo,* that Plaintiff's video recordings constitute advertising, the main purpose of www.biblegreg.com appears to be religious evangelism, a non-commercial and constitutionally protected activity.  Mason, 2006 WL 3230279 at 4; see also Murdock v. Pennslyvania, 319 U.S. 105, 110-111 (1943) ("spreading one's religious beliefs or preaching the Gospel through distribution of religious literature. . . is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types" and "the mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise").  Because Plaintiff's practice of distributing religious material on his website is constitutionally protected, the video recordings that he captured on SCCC's campus are entitled to protection under the First Amendment and exempted from Section 50.  Accordingly, Plaintiff's act of capturing the videotapes also does not run afoul of Section 50.

### 4.      Plaintiff's Removal from Campus fails heightened scrutiny

Plaintiff thus had a First Amendment right to videotape his actions on campus.  In addition, Defendants have not presented a significant government interest to support restricting Plaintiff's right to preach, hand out leaflets, and videotape his preaching.  Accordingly, his removal from the campus, based on the application of the trespass statute or any possible SCCC regulation or policy in effect, fails heightened scrutiny, because the government's restriction on his activity was not narrowly tailored to serve a significant government interest.

### F.      Eleventh Amendment

Defendant D'Annibale contends that Plaintiff's claims against him pursuant to 42 U.S.C. §1983 are barred by the Eleventh Amendment.  Def's Mem. at p. 9 (Dkt. No. 67, Attch. No. 1).

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." As noted in Dwyer v. Regan, the Supreme Court has consistently held that the federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, as the literal language of the Amendment provides, but also over suits against such states brought by their own citizens.  777 F.2d 825 (2d Cir. 1985), modified, 793 F.2d 457 (2d Cir. 1986).  Thus, it is clear that, with few exceptions, federal courts are barred from entertaining suits brought by a private party against a state in its own name.  Dube v. State University of New York, 900 F.2d 587, 594 (2d Cir. 1990); Dwyer, 777 F.2d at 835; see also Papasan v. Allain, 478 U.S. 265, 276 (1986).

Although Congress is empowered under section five of the Fourteenth Amendment to override Eleventh Amendment immunity and "to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority," Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976); Dube, 900 F.2d at 594 ; see Dwyer,777 F.2d at 835, it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of that authority.  Quern v. Jordan, 440 U.S. 332, 340-42 (1979).  Therefore, since Plaintiff's federal causes of action are brought under section 1983, "in the absence of consent, [any claims against] the State or one of its agencies or departments . . . [are] proscribed by the Eleventh Amendment."  Pennhurst State School and Hosp. v. Halderman, 465 U.S. 89, 100

20

(1984).  "This bar exists whether the relief sought is legal or equitable." <u>Papasan</u>, 478 U.S. at 276.

For Eleventh Amendment purposes, SUNY "is an integral part of the government of the State [of New York] and when it is sued the State is the real party." <u>State Univ. of New York v. Syracuse Univ.</u>, 285 A.D. 59, 61, 135 N.Y.S.2d 539, 542 (3d Dep't 1954).  SCCC is an entity of the SUNY system.  Thus, no relief, either legal or equitable, would be available against SCCC. <u>See</u> <u>Dube v. State University of New York</u>, 900 F.2d 587, 594 (2d Cir. 1990), <u>Fox v. Board of Trustees</u>, 649 F.Supp. 1393, 1397 (N.D.N.Y.1986), <u>rev'd on other grounds</u>, 841 F.2d 1207 (2d Cir. 1988), <u>rev'd</u>, 492 U.S. 469 (1989); <u>Williams v. State Univ. of New York</u>, 635 F.Supp. 1243, 1249-50 & n. 4 (E.D.N.Y.1986).

On the other hand, a state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar.  <u>Papasan</u>, 478 U.S. at 276-77; <u>Pennhurst</u>, 465 U.S. at 102; <u>Ex parte Young</u>, 209 U.S. 123, 159-60; <u>see also</u> <u>Edelman v. Jordan</u>, 415 U.S. 651, 677 (1974) ("a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief . . . and may not include a retroactive award which requires the payment of funds from the state treasury").

The Court also notes that the conclusions derived from this Eleventh Amendment analysis are reinforced by a recent Supreme Court ruling interpreting 42 U.S.C. § 1983 in a non-Eleventh Amendment context.  In <u>Will v. Michigan Department of State Police</u>, the Court held that "neither a State nor its officials acting in their official capacities are 'persons' under §

1983," and thus are not subject to liability for deprivations of constitutional rights thereunder.

491 U.S. 58, 109 S.Ct. 2304, 2312 (1989).  However, this holding was qualified with the

statement that "a State official in his or her official capacity, when sued for injunctive relief,

would be a person under § 1983 because 'official-capacity actions for prospective relief are not

treated as actions against the State.'"  Will, 109 S.Ct. at 2311 n. 10 (quoting Kentucky v.

Graham, 473 U.S. 159, 167 n. 14 (1985)).

Although Plaintiff's claims for damages against Defendant D'Annibale[7] are barred by the

Eleventh Amendment, his claims for equitable relief are not.  Since Defendant D'Annibale was a

state official, the Dean of Administration at SCCC, acting in his official capacity when he

violated Plaintiff's First Amendment rights, he may be sued in a federal forum to enjoin that

conduct, notwithstanding the Eleventh Amendment bar.

### G.    Qualified Immunity

Defendant D'Annibale also contends that he has qualified immunity from suit.  The

defense of qualified immunity protects "government officials . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The rule of qualified immunity "provides ample support to all but the plainly incompetent or

those who knowingly violate the law."  Burns v. Reed, 500 U.S. 478, 494-95 (1991) (quoting

Malley v. Briggs, 475 U.S. 335, 341 (1986)).

A claim of entitlement to qualified immunity is subject to a three-step analysis.  Harhay v.

---

[7] Plaintiff's claims for damages are barred as against all Defendants.  Both the Mayor and the Police Chief are state officials who Plaintiff is suing in their official capacities.

Town of Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003).  As a threshold matter, it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation.  Id.; Gilles v. Repicky, 511 F.3d 239, 243-44 (2d Cir. 2007).  If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation.  Id. (citing Saucier v. Katz, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001)); see also Poe v. Leonard, 282 F.3d 123, 132-33 (2d Cir. 2002).  Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law.  Harhay, 323 F.3d at 211; Poe, 282 F.3d at 133 (quoting Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (quoting, in turn, Salim, 93 F.3d at 89)).

As discussed above, the Court has already determined that Defendant D'Annibale violated Plaintiff's federally protected First Amendment Rights.

Courts apply the test articulated by the Supreme Court in Anderson v. Creighton to determine whether the right is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  483 U.S. 635, 639-640 (1987).  It is not necessary that the specific action in question previously have been declared unconstitutional, so long as the unlawfulness was apparent in light of preexisting law.  483 U.S. at 640.

Although Plaintiff's right to videotape his activities may not have been a clearly established right at the time of Plaintiff's preaching, his rights to be present on the public grounds, to preach, and to hand out leaflets were all clearly established.  More importantly,

23

Plaintiff's removal from the campus was premised upon D'Annibale's assertion that the campus and the Quad was private property.  This claim necessarily implied that Plaintiff had no right to be present, to preach, to hand out leaflets, or to videotape on the property without permission. D'Annibale also claimed, both to Plaintiff and to the police officers, that Davis was in violation of SCCC's regulations by remaining on the privately-owned campus.  However, Defendant D'Annibale was aware that SCCC was public property, Criminal Trial Transcript (1/18/07), at 74 (as renumbered); D'Annibale Dep. at 59, and later acknowledged that no written policy was violated by Plaintiff's presence.  Criminal Trial Transcript at 81.  Accordingly, by having Plaintiff removed from the campus based on the premise that the property was private – a premise which D'Annibale knew to be false – D'Annibale violated a right that was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. at 640.  In addition, because D'Annibale knew the falsity of his claim that the Quad was private property, it was not objectively reasonable for him to believe that his action did not violate Plaintiff's rights.  D'Annibale is thus not entitled to qualified immunity.

**III.    Conclusion**

Accordingly, it is hereby

**ORDERED**, that Plaintiff's Motion for Summary Judgment (Dkt. No. 68) is **GRANTED**; and it is further

**ORDERED**, that Defendant D'Annibale's Motion for Summary Judgment and Dismissal (Dkt. No. 67) is **DENIED**; and it is further

**ORDERED**, that Defendants, their officers, agents, servants, and employees, and all persons in concert or participation with them are **ENJOINED** from (i) applying N.Y. Penal Law § 140.05 to shut down protected speech; and (ii) prohibiting Plaintiff from preaching the Gospel, leafleting, videotaping, and holding signs in the designated public fora of SCCC, to include, but not be limited to, the Quad area outside Elston Hall at SCCC, so long as Plaintiff complies with the Rules and Regulations of SCCC; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:      September 9, 2008
            Albany, New York

Lawrence E. Kahn
U.S. District Judge